Okay, we've got three oral arguments today. First one is D.D.R. Holdings. Mr. Zivin, are you ready to proceed? Good morning, Your Honors. Good morning. The gist of this appeal is threefold. First, you're reserving three minutes, right? Correct, Your Honor. No one skilled in the art would understand whether or not there was an infringement in this case because of the use of the indefinite term look and feel, or sometimes used as visually perceptible elements. Second, the claimed subject matter is not patent eligible because it is an abstract concept couched in computer language, which is conventional. There's nothing additional to the conventional language that's there other than the indefinite term look and feel. And third, because there was no substantial evidence to support the jury's finding or verdict of infringement. I'll now be more specific. The principal reason that one skilled in the art cannot determine what is an infringement is that the claims are indefinite. We all know that the claims of a patent must define the meets and bounds of the invention. In this case, the term look and feel or visually perceptible elements does not define any meets and bounds. There is no drawing in this patent, unlike perhaps in other cases where the claims were found definite, that would describe what it is that's covered by the claims. There is no description in the specification, which would tell you how you know whether two websites have the same look and feel. I think if, you know, in the abstract, the words look and feel sound kind of impressionistic. But in this particular field, when it comes to graphical user interfaces, web design layouts, isn't the term look and feel a term of art? Well, the term is used by computer people in a sort of fuzzy way. There's no real objective standards or to the extent that there are objective standards to determine whether something has the look and feel of something else. Those objective standards are not in this patent and were not applied. One of ordinary skill in this art would be familiar with the term look and feel, right? I think, Your Honor, that the answer is one may have heard that term, one may have used that term. It's been around for 30 years, right? One has used that term. But in the practical application in this case, one cannot determine what look and feel means. And I think that's evident when you look at the screenshots that we have at pages 35 to 37 of the blue brief. The plaintiff accused, I think, nine, eight or nine websites of having a substantially matching look and feel. But at trial, they dropped some of them and they added others. So that the ones that were found to have, by the jury, to have a look and feel similar to a host website, and the ones that were not presented to the jury, there's no distinction between them. All of the websites run on a common platform. They all use the same computer code. And yet some were presented to the jury and others were dropped. There's no distinction between those in terms of what is similar and what isn't similar. The plaintiff's choices of what they want to accuse of infringement, I don't know how that plays into the equation of what one of ordinary skill in the art would understand the claim term to mean. You've got to look at the claims and the specification, the prosecution history, perhaps how the prior art was using the term. I think we can look at all of those. But there is nothing in the specification which tells you how you know what the look and feel might be. Doesn't the specification identify a series of look and feel elements that are in fact consistent with what you would imagine the overall look and feel to be? Well, what they do is they give you a list of four or five things, only two of which were even mentioned at trial, the trademark and the color. And so what it comes down to is that if you use someone else's brand, someone else's trademark on your website under a license, under their definition you would automatically have the same look and feel. I don't know if that's right though. I thought they distinguished a prior art reference during the prosecution where they were saying a logo alone by itself, if that was the only thing that got transferred over onto the composite web page, that wouldn't quite make the grade for capturing the look and feel. Well, that may have been what they said in the prosecution, but that isn't what happened at trial. But that's part of the intrinsic evidence, right? But the part of the intrinsic evidence, Your Honor, is also the prior art. And the prior art that was described in great detail at the trial was by our co-defendant, Digital River, which had a Digital Frontiers website and that website had not only the logo but also the navigation buttons. So it had the same elements that they are saying is a look and feel. The plaintiff tried to distinguish this by saying, well, that was a fake look and feel, not a real look and feel. Well, maybe that reference in fact anticipates the claimed invention. Well, it certainly was the position at trial by our co-defendant. You adopted that position and you're free. We adopted it by reference. We did not argue it because they argued it and we didn't want to repeat it. But they're not here. Are you going to discuss the anticipation argument? I'm not going to discuss the anticipation argument, Your Honor. I just refer to that one view comparing the two websites and it's in the appendix. JA-6172 and JA-6171 look pretty interesting. It appears that the host website's logo and font and navigation bar all made it over from the host website to the composite web page from the SSS system. Yes, I actually had down 7502 and 7494 and if you compare those you'll see that they carried over. But the test came down to, at the trial, I know it when I see it. There was no one who was an expert on the subject of consumer perception. So how is the jury to determine whether a concept is concrete and definite or whether it's just abstract and covers anything? The fact that, and I keep coming back to this, the fact that the plaintiff kept changing its own position shows that they didn't know what was covered by their claims and what wasn't. Their expert report had three websites in it, Priceline, United Airlines, and USAir. They dropped two weeks before trial the USAir and United Airlines website and then added six or seven more. You stipulated to a claim construction here for look and feel, right? There was a claim construction which just copied the words out of the spec. We reserved the right at that claim construction, it was in the order, we reserved the right to continue to object that the claims were indefinite under section 112. They're words but they don't describe anything objectively in terms of what could be constituted a same look and feel or not. There's one other point here too. It doesn't just say look and feel or visually perceptible elements. It says based on or corresponding to or derived from a host website's look and feel. That makes it even more abstract and even more indefinite because it doesn't have to be the same. It just has to be based on. Did you argue that below? We didn't argue that but the words are there. They were not part of the claim construction. I presume you're not talking about 101 because you think it's so clear. I am talking about 101 as well, Your Honor. That's the next point I was going to get to. I think we do have a claim, a good one, that this patent claims are… This is your stronger argument. Well, I had them equally. In fact, I started that way in our brief. But I think the claims are abstract under section 101 and therefore are not patent eligible. Mr. Ziven, when I looked at your brief, it looked like you were articulating the underlying abstract idea in various different ways. Can you tell me what it is? What's your best articulation of the underlying abstract idea? I think our best articulation and in all frankness, that's an issue which is very contentious in the court system. But I think our best argument is that it's a conventional computer system operating in a conventional way with no meaningful limitations or technical distinctions. All it is, if you strip away first the abstract concept, which is having a look and feel similar to a host website, from the remainder of the claim, the language just talks about conventional elements. A computer, a processor, a storage, a display, doing nothing other than what those elements ordinarily do. And the only thing that's added is having a look and feel similar to a host website. This is not a look and feel that's obtained by, if there is any way to define it, it's not obtained by some capturing method, which is what's described in this patent, which was what their original patent was directed to. The patents ensued our continuations. The original patent was dropped from the case at the Charlie before Trump. Which Federal Circuit case would you say that the facts of this case are most like? When I look back at a lot of our court's authority, a lot of those cases seem to be more kind of business method oriented. A method of handling a loan application for a car purchase, or a method of deferring tax liability through some kind of real estate investment tool, or some method of hedging risk. And then maybe the claims went on set on a computer. Here, there seems to be something a little more technical in nature going on, which is, whereas maybe those cases, one of ordinary skill in the art would be some currency exchange broker or hedge fund manager. Here, one of ordinary skill in the art, I think, would be a web designer who's trying to take elements from different web pages and using them together to create a composite web page. No, that's not what happens here. What happens here, and I agree with you that most of the cases do go off on that, but what happens here is that we have a store, we have a memory, and in that memory there are a number of pieces of artwork representing different host websites of one sort or another. And then 90% of the content is supplied by our client who sells cruises. And all they do is use the brand name and perhaps some part of the coloration from the... You're into your rebuttal time, Mr. Zinn. I'll finish this answer, if I may. We're using the brand name and to some extent, some coloration, sometimes yes, sometimes no, of the host website, and then adding our content to it. And that did not comprise anything other than what we did manually before. Just to sum up, Your Honors, our position is that these claims are not objective, they're subjective, and therefore do not meet the test of 112. They claim an abstract concept and therefore do not meet the patent eligibility of 101. And the evidence of infringement was simply a guess by the jury without any substantial evidence behind it. We ask that the judgment below be referred to. Thank you. Thank you, Your Honor. May it please the Court. With regard to definiteness, it is not the law to demand mathematical precision, such as some certain number of matching elements or some other standard, such as what Talon is arguing for, in order to correspond to the evidence of infringement. Rather, one has the right to define claim scope by saying that the overall appearance of one website must correspond with another and leave that infringement question to a jury. Talk to me about the anticipation question involving the SSS reference. Sure. Well, first of all, WTH did not make any motion for JMAL below on anticipation. They did not properly adopt Digital River's argument, however, under the rules. They did not preserve or appeal an argument, and all they did was adopt a footnote in their opening brief on appeal, which has been held not to be enough. They referred to Digital River's anticipation argument. They didn't preserve it below, either by making any kind of JMAL or motion. They did not also appeal the JMAL against them that we entered on one of the two patents. So I don't believe they properly preserved that argument for appeal, Your Honor. Is that your only answer to that? No, of course not. What we showed at trial was, and as we briefed in connection with Digital River, is that the look and feel of the prior art sites, they just simply didn't correspond in overall appearance, which was the test established by the agreed-upon claim construction. The jury saw ample evidence of the sites and concluded that the websites did not correspond. There were other more subtle differences, but that was the one that was focused on at trial. What about A6171 compared to A6172? I raised this to your opposing counsel a few minutes ago, and it looks like just about anything that could be regarded as a look and feel element on the host website got transferred over to the composite webpage. I'm talking about the logo, I'm talking about the navigation bar, I'm talking about the font. It was a pretty simple overall look and feel, and there weren't 20 different elements. It was pretty simple, straightforward, clean, and it made it to the composite webpage. The best one, do you remember, was that the Digital Frontier one, Your Honor? Yeah. Digital Frontier, the two sites that were in Digital Frontier's advertisement, also talked about how it's all about preserving the look and feel of the host website. There were a number of statements about the attempt to match look and feel, but the overall appearance did not correspond. That's what the jury concluded after considering the pages and comparing the overall appearances. You have to be careful also that the websites that was, in fact, the host website you're looking at as opposed to internal pages that look the same. There were buttons, but they didn't look similar. At trial, there was evidence of certain differences between the sites that were presented to the jury by the experts and in cross-examination of Digital River's witnesses. There's a lot of different examples, and maybe not all of them show every single look and feel element making it over to the composite webpage, but I'm pointing to an example where it did look like, in fact, that happened. Its advertisements specifically talk about preserving look and feel of your selling environment on your host webpage, and so that it seamlessly looks like the customer is still on your website. It says all those words, right, in the advertisement? I recall that there were some discussions about that of what Digital River claimed to be doing, and some of the purposes did indicate some similarity, but this court is here to review appealed judgments, and this issue was not appealed by this defendant, and the jury had a different opinion that is entitled to respect as long as what they've seen is some evidence of difference. I don't think on the question of whether the claims are sufficiently definite, which is an issue on appeal, the jury didn't have any trouble reaching, or we don't have any trouble assigning to juries the responsibility for deciding whether a claim is sufficiently close, whether a look and feel is sufficiently close to see whether a cart falls. We need to know with one of ordinary skill in the art to figure out what look and feel means, right? Well, and what if it was transferring the logo, the navigation bar, and the font from the host webpage over to the new composite webpage? Would that be enough? It would be enough if the overall appearance of the website corresponded, and it's not an issue of counting elements. It's looking at the overall correspondence, and we know that this court's previous jurisprudence allows juries to determine such things as whether, as in the Starr II case, there was a controlled environment to curing tobacco, and by the way, the specification there didn't have specific standards of humidity, temperature, airflow, etc., or metabolite, which allowed the trier fact to determine if amino acids were correlated with a vitamin deficiency, which is also a comparison. And we know that assigning to juries the question of holistic similarity of appearance is not beyond jury confidence, because we assign that question in every single design patent case. And this particular claim limitation is... This isn't a design patent. True, but this particular claim limitation is identical to the test for infringement of each one of the quarter million design patents out there that would be litigated. The datamized case discussed, which was cited in reply by WTH, rejected an argument that the term aesthetically pleasing should be required... ought to be definite, because it is a threshold question of patentability in design patent cases, but that's not the test for infringement of a design patent. And here, the claim term required substantially similar overall appearance according to the agreed-upon and court-ordered claim construction. Can we move to 101? Sure. What do you think is the abstract idea in this claim? I don't know. I mean, I think that the court has... You better come up with something. Well, I think it's the WTH's burden to identify an abstract idea that they think this doesn't go beyond. There is loss, certainly, saying that an abstract idea... every claim can be turned into a gist into an abstract idea in some sense. What we have here, though, is... Let me ask it differently, then. Yeah. What was the inventive concept? The concept was to use computers to have websites that are linked in such a way that you could... that you had a similar look and feel from the two websites, and yet the user would have a comfort in making a commercial transaction on an outsourced website. And there's specific computer technology in order to do that. The SSS marketing materials say that their system, quote, maintains a consistent look and feel between the proposed store and your website. I have that in the anticipation section. How does it differ? Well, there are plenty of other inventions that use the same language of trying to accomplish the abstract result. And what Digital River didn't do was link the websites in such a way that the look and feel would correspond over. In conventional websites, they look the same regardless of where you reach them, depending on... without regard to what source page there is. And they don't require the operator to give a special URL to link to them, you know, because in our 399 patent, for example, we require recognizing as a source webpage the one of the first webpage on which the link has been activated. And these are not conventional in normal websites. This is assuming there was any record on it. The record below is that WTH argued that there were non-infringing alternatives. Among those are alternatives that Digital River... Well, what we showed the jury was that the Digital River alternatives that were done in advance were in fact not within the scope of the claims, hence non-infringing alternatives. But in addition, there was evidence that WTH itself introduced through its expert about a notion of passing data to a host without linking to a page, or periodically passing data to a host webpage. So you could have the same concept of the corresponding look and feel in many ways that are not covered by this patent. Under any preemption analysis, under any of the opinions of CLS Bank, either preemption or whatever the language is that you're going to use to define that concept, whether it's assuming full scope or covering all possible ways or so forth, these claims pass muster. I did want to say on 101 also that we're talking about claims that undisputably pass the machine or transformation test. Although the Supreme Court said that that is not the only test, the Bilski case also called it an important clue in patentability. So we're talking about the narrow category of things that are machines and yet are argued to be 101 unpatentable. But this court has invalidated claims that were machine implemented under section 101, right? So that alone isn't going to carry the case. Agreed, not alone. What the court in CLS, what this court in CLS did was said, we're going to look at whether it's preemptive, which is not the case here. And then the Supreme Court more generally, when you look at the categories of cases that they seem to be concerned about, aside from the issue of preemption, it seems to be merely using a generic computer to automate routine manual tasks. That although WTH argues that's the case, there is no evidence of that, and the claims themselves have limitations that belie that argument. And so I don't think under any of the tests of patentability likely to appear, or presently existing, that we have a 101 patentability. Do you think it makes sense for us to hold this case until we get the decisions in Biosig and CLS Bank? Maybe ask the supplemental briefing. Well, certainly we'd be happy to provide supplemental briefing if the court requests it, but I think that in CLS Bank there isn't a real test out there right now, and so yes, it might be prudent to wait for CLS Bank. I wanted to, but that's probably only two months anyway, so I'm not sure if it makes any difference. We should wait for Biosig. Justice Scalia made a point at one moment in the argument where he said that he described Chevron, and a Chevron analogy as encapsulated as close enough for government that maybe you'll be able to call back. Well, on the Biosig Nautilus case, Your Honor, with respect to the sufficiently definite, certainly they come out in the same period, but I think this case is different in any event because that was dealing about a case where the question was whether the claim was capable of being construed. Here we have an issue of different sort, which is more of the datamized area, and datamized called for barring claim terms that were applying normative judgment, like tastes, opinions, feelings, as opposed to a description. Your time is up. Thank you, Your Honor. If I may, I will answer the question that Judge Chen asked, and that is, yes, I think this Court should await the decisions in Biosig and CLS Bank. Perhaps they will clarify the law, perhaps they will not, but at least we'll know what the Supreme Court had to say on the subject. On the question of the abstract nature of these claims, counsel described the inventive concept as linking websites by look and feel, and that we believe is a nose-of-wax kind of argument. The nose-of-wax being, in order to distinguish over the digital frontiers and other digital river prior art, they said that isn't the real look and feel, that's just a fake look and feel, it's only partial look and feel. And yet, to allege infringement by us as well as other defendants, they took the position that any use of the logo and maybe some part of the color is sufficient, and there's no distinction between the two. I don't know if we can let litigation positions influence how we're going to understand the claim and figure out whether it's definite. Your Honor, I don't think... Or abstract. I don't think that you could just look at these claims in a vacuum. You have to look at the way they're being interpreted. They're being stretched to an extent that was never contemplated in the original patent application. But it's tough to do the interpretation, right? It's a question of law. It's a question of law for you to do the interpretation. But I think the fact that the plaintiff itself has had such a changing position as to what the meaning of these claims is, that one cannot determine what they mean or how abstract they are. You have to have some guidance. You can't just look at the case in a context, just the way a jury cannot be asked to decide  What's wrong with looking at the claim this way? We have a lot of inventions that we patent where it's based on taking elements from one source, taking elements from another source, and creating some kind of composite from those elements from the two sources. And that's maybe what we have here. We have elements from one web page, the host website, some elements or content from another website, and then bringing them together, merging them together into a composite web page. And then beyond that, the claim actually calls for how you would achieve that by presenting a link that can be activated on the home website, the host website. And when you click on that, then from there you take the elements that are stored in the database, you combine that with the content from the activated link, and you create your composite web page. I mean, I don't know if that's an abstract idea. It is an abstract idea, because the elements that are stored are simply artwork, and what's on our client server is the content. So all they did is put the content, which they have a trademark license to use, on top of the content. And that didn't require anything more than what one could do by a human. Go ahead and wrap it up. Your Honors, I submit that the judgment below should be reversed for the reasons that we stated in our briefing. Thank you. Thank you, counsel.